Causici v. La Coste.

ANGELO CAUSICI v. J. B. LA COSTE AND ANOTHER.

Castro's colonists, who were received by him under contracts by which they undertook to convey to him one-half of the land which they should receive as colonists, were not estopped (whether in view of the provision in the Ordinance or on general principles was not stated) by the Act of January 22d, 1850, to perfect the land titles in Castro's colony; (Hart. Dig. p. 699;) and the proof being that Castro had forfeited his contract with the Government, and that the colonists had failed so far to conform to the requirements of the law of colonization as to become entitled to land under it, said contracts between Castro and his colonists became inoperative and void, and could not attach to the rights acquired under said Act of 1850; which, in view of the proof made, must be deemed to be pure donations. (The Act of 1850 conceded to Castro and his colonists, the lands which they would have become entitled to, and in the same terms as, if the law of colonization had been complied with.)

If a legislative grant is not made in discharge of some obligation of the Government, which the law recognizes, it cannot be deemed, in a legal sense, anything but an act of sovereign grace and bounty on the part of the political authority, it matters not how meritorious the considerations are upon which such donation is made.

Appeal from Bexar. Tried below before the Hon. Thomas J. Devine.

On the 15th of February, 1842, the following contract, commonly known as Castro's, was made with the President of the Republic of Texas :—

Whereas by the fourth Section of an Act of Congress passed the fourth day of January, A. D. 1841, entitled "An Act granting land to emigrants," the President of the Republic of Texas is authorized to contract with certain persons therein named, for the purpose of colonizing and settling a portion of the vacant and unappropriated lands of the Republic, and whereas by another Act of Congress passed the fifth day of February, A. D. 1842, entitled "An Act amendatory of an Act granting land to emigrants," approved January 4th, 1841, the provisions of the Act first above cited, so far as relates to the authority thereby given to the President to enter into a contract with W. S. Peters and others (named in said Act,) to introduce colonists upon cer-

tain terms therein expressed and set forth, are extended to such other company or companies as may be formed and organized for like purposes, as the President may in his judgment approve. Now, therefore, this contract and agreement made this fifteenth day of February, A. D. 1842, at the city of Austin, between Sam. Houston, President of the Republic of Texas, on the part of said Republic of the first part, and Henri Castro and John Jassaud and their associates of the second part, witnesseth, that for and in consideration of the grant and privileges, rights and immunities hereinafter mentioned, the said party of the second part contract and agree to introduce or cause to be introduced a colony of six hundred families or single men over the age of seventeen years, within three years from the date of this contract, and have the same settled within the limits of the tracts of land hereinafter specified and set apart for said party of the second part, all of which said families or single men are to be free white inhabitants of a foreign country, and to reside within said limits.

In consideration whereof, the said party of the first part hereby designates, assigns and sets apart for the said parties of the second part, and for the settlement of said colony, the three following described tracts of land, that is to say : Tract No. one, commencing at the Laredo crossing on the left bank of the Rio Frio ; thence along the Laredo road to the dividing ridge of the Rio Frio and Medina waters to a point equidistant from these two rivers ; thence with that range as nearly equidistant as practicable, as above, to a point twenty miles north of the Upper Presidio Rio Grande road ; thence in a direct line to the point of confluence of the Arroya de Uvalde with the Rio Frio ; thence down the left bank of the main branch of the Rio Frio to the point of commencement.

Tract No. 2, consisting of one-fourth part of a tract twenty miles in breadth on the east bank of the Rio Grande, commencing on the Rio Grande five miles below the crossing of the road from the salt lakes of San Patricio county to Camargo, and stretching upwards along the left of the Rio Grande to a point ten miles above the Dolores ferry, which tract is to be divided into four equal parts, each fronting on the Rio Grande, which are to be numbered " one," "two," " three" and " four," the numbers commencing at the lowest point on the Rio Grande.   The portion now set apart and designated as tract No. two to Henri Castro and John Jassaud and their associates, is the part No.

-one of the above division.   Tract No. three now set apart to Henri Castro, John Jassaud and their associates is part No. three of said division.

And the said party of the first part further contracts and agrees in behalf of the Government of Texas, to give and to grant to each family so introduced by the said parties of the second part, who shall reside within the said described limits, six hundred and forty acres of land, to be located in a square as nearly as possible within said limits, and to each single man over the age of seventeen years so introduced three hundred and twenty acres of land; each of which said grantees shall be entitled to receive from the Government of Texas a full and absolute title to the same whensoever they shall have built a good and comfortable cabin upon it, and shall keep in cultivation and under good fence at least fifteen acres on the tract for which they are to receive title.

And the said party of the first part further contracts and agrees to allow the said party of the second part, as a compensation for their services and in recompense of their labor and expense attendant on the introduction and settlement of the families introduced by them, a premium of ten sections of land for every hundred families, and in the same ratio of half sections for every hundred single men so introduced and settled, but no fractional number less than one hundred will be allowed any premium, which said premium lands must be selected from the vacant land within the limits of the tract of land above designated and set apart for the settlement of the said colonists.

And the said party of the first part further contracts and agrees in behalf of the Government of Texas, to give and grant to each settlement of one hundred families made under the provisions of the before recited Acts in conformity with the conditions of this contract, one section of six hundred and forty acres of land, each of which said sections shall be located as near the centre of the settlement receiving the same as may be practicable, and shall be used by said settlement to aid and assist them in the erection of buildings for religious public worship, and it is mutually agreed by the parties to this contract that all legal locations that may have already been made within the boundaries so designated, or that may hereafter be made and surveyed previous to the fifteenth day of April next, shall be respected, and any locations or surveys made by the said party of the second part or their emigrants on such locations shall be null and void.

And it is further agreed between the parties of this contract, that all lands lying within limits of the tracts which have been designated and set apart for the said party of the second part, which shall not be appropriated according to the terms of this contract to the emigrants, or for premium or church lands, shall, after an expiration of two years, revert to and remain the sole property of the Government of Texas as a part of the public domain.

And it is further agreed between the parties to this contract, that unless the parties of the second part shall have introduced two hundred families, that is to say, one-third of the whole number of families which they have contracted to introduce, within the limits of the Republic before the expiration of one year from the date of this contract, then the said party of the second part shall forfeit all the lands and immunities, rights and privileges of whatsoever kind, name and nature, that they may have previously acquired by virtue of this contract.

But no forfeiture on the part of the party of the second part shall in any manner prejudice the rights of such families and single persons as they may introduce, who shall be entitled to their respective quotas of land in the same manner as if the said party of the second part had completed their contract.

And it is further agreed between the parties to this contract that the following shall be the definition of the word family as it is used in this instrument, namely : First. A man and his wife. Second. A widower and two or more children; if males, under the age of seventeen years ; if females, unmarried. Third. If a widow, the same as a widower. Either of which three classes shall be considered as constituting a family in the construction of this contract.

And it is further agreed between the parties to this contract, that the said party of the second part shall not be permitted to introduce any emigrant who has been guilty of any atrocious crime or who is of bad moral character, nor shall they nor any of the families or persons introduced by them be permitted to sell or give any spirituous or intoxicating liquors to any Indian or Indians, nor shall they furnish them in any manner with powder, lead, firearms, or with any other kind of warlike weapons, upon pain of forfeiting when convicted thereof, all the lands they may have acquired by virtue of this contract.

And it is further mutually agreed between said parties, that the party of second part shall be bound to have designated and

surveyed all the lands required for the settlement of the families they are authorized to introduce by virtue of this contract, also for premium and church lands, within two years from the date of this contract, after which it shall be permitted to any citizen of the country to locate and settle upon any lands which may remain unappropriated within the limits of the tracts designated and set aside for said party of the second part.

And it is also understood and agreed upon between the parties to this contract, that each alternate section of land in the tracts No. one (1) and three (3) on the Rio Grande, except for the premium and church lands; shall be reserved and forever set apart for the use and benefit of the Republic of Texas.

And it is also understood and agreed upon, that the said party of the second part will have the privilege to introduce and settle upon the lands herein designated, an additional number of four hundred families or single men over seventeen years of age, provided the said party of the second part shall within one year from the date of this contract give to the party of the first part a written notice of an intention so to do, which additional number shall be introduced and settled agreeably to the terms of this contract, as provided for the six hundred families or single men over seventeen years of age herein above specified.

And whereas, by the thirteenth Section of an Act entitled an Act granting land to emigrants, passed the fourth day of January, A. D. one thousand eight hundred and forty-one, power is given to the President to extend the time for the introduction of the first one-third of the whole number of families or single men over the age of seventeen years, and whereas the emigrants to be introduced and settled under this contract are to be brought from Europe, therefore the party of the first part agrees to extend the term for the time of six months over and above the time of one year above specified to the party of the second part for the introduction of said families or single men.

And it is further agreed between the said parties to this contract, that if it shall be found to conflict with any of the provisions of the Acts aforesaid, it shall so far be considered null and void, and the said Acts shall govern the construction to be placed upon it, but this shall not be considered as extending to or affecting any other part of this contract that may be consistent with said Acts, which shall be and remain in full force.

In testimony whereof, we have hereunto set our hands and affixed our seals at the city of Austin, this fifteenth day of Feb-
18

ruary, in the year of our Lord one thousand eight hundred and forty-two.

[The seal of the Republic of Texas.] SAM. HOUSTON.

          H. CASTRO. [L. S.]

          J. JASSAUD, by

          H. CASTRO. [L. S.]

[The seal of the Department of State.]

  Attest,  ANSON JONES,

     Secretary of State of the Republic of Texas.

By an Act passed by the Republic in the year 1845, the time for the peformance of said contract was extended to the 15th of February, 1847.

An Ordinance which was adopted in connection with the Constitution of the State in 1845, (Hart. Dig. p. 84,) required the Attorney-General or the District Attorney of the district in which any colony was situated, as soon as the organization of the State should be completed, to institute legal proceedings against all colony contractors who had entered into contracts with the President; and if, upon such investigation, it should be found that any such contract was unconstitutional, illegal or fraudulent, or that the conditions of the same had not been complied with according to its terms, such contract should be adjudged and decreed null and void; but that all actual settlers under any such contract should be entitled to their quantity of land as colonists —not to exceed 640 acres to the head of a family, and 320 acres to a single man. And in all suits brought by or against any contractors, or any person claiming under, by or through them, or either of them, it shall be lawful for the adverse claimant to set forth any plea that it would have been competent for the State to plead; and the party may introduce testimony to prove the claim or title to have been forfeited, as well for frauds, or illegality, or unconstitutionality, as on account of a failure to comply with the conditions of the original grant or contract; and any such pleas shall be deemed good and valid in law, in all such suit or suits in this State. And further, "that the Legislature is hereby restrained from extending any contract for settling a colony, and from relieving any contractor from the failure of the conditions, or the forfeiture accruing from non-compliance with the contract."

The legal proceedings directed by the Ordinance were never

instituted. On the 22d of January, 1850, the Legislature passed an Act " to perfect the land titles in Castro's colony." The first Section enacted that the colonists should receive the lands promised them, and that the " contractor, H. Castro," should receive his premium lands for the colonists introduced by him. The second Section provided a Commissioner to hear proof and determine what families had been introduced by said contractor, and to issue certificates for the proper quantity of land to each colonist, and to Castro for his premium lands. The other Sections of said Act provided regulations and matters of detail, among which was the following requirement : " That to entitle any colonist to the benefits of this Act, such colonist shall take the following oath : I (A. B.) do solemnly swear that I was introduced into Texas by H. Castro, according to the contract signed between us, in virtue of the colonization contract of said H. Castro with the Government of Texas, before the 15th day of February of the year eighteen hundred and forty-seven, and shall also prove the facts in said affidavit by at least two respectable witnesses." To entitle the contractor to his premium lands, he was required to prove the number of colonists introduced by him before the 15th of February, 1847, by his own oath and the testimony of three disinterested witnesses, to the satisfaction of the Commissioner.

On the 22d of August, 1855, appellant, as assignee of Castro, brought suit against the appellees, as assignees of certificates issued to certain colonists by the Commissioner appointed under the Act aforesaid, for specific performance of the contracts of emigration under which said colonists were received and admitted by said Castro, and for partition. The plaintiff also alleged that certain of the assignors of defendants had selected the lands to which they were entitled in 1848, and had then renewed their contracts with said Castro, in writing, to convey to him the half to which he was entitled, but that after obtaining their certificates from said Commissioner, they had located them elsewhere, or assigned them to defendants who had located them elsewhere. It was also alleged that certain of the assignors of defendants, after they had obtained their certificates and located them, transferred to said Castro the half to which he was entitled ; but afterwards removed said certificates to other locations, or sold them to defendants who so removed them. The present locations of all the certificates, with the field-notes, were set out ; and it was alleged that defendants in every instance had notice of the claim of said Castro.

Defendants answered that if any such contracts were ever made, which they denied, defendants were purchasers in good faith, without notice thereof; that if any such contracts were ever made, they had become void by reason of the failure of Castro to perform the conditions of his said contracts with the colonists; and that Castro had wholly forfeited his contract with the Government before said certificates were granted, whereby said lands were lost to him and to said colonists; that said certificates were finally granted by virtue of a legislative grant, and that Castro never had any equitable interest in said certificates.

The facts proved at the trial, and not stated already, were as follows: Assignment from Castro to plaintiff, dated Oct. 3d, 1853. It was proved that all the parties named in the petition as colonists were introduced into Texas by Henry Castro, as his colonists, under his contract with the Government, and by virtue of private contracts between them individually and said Castro, before the 15th of February, 1847. They received their certificates as such colonists for the several quantities of land mentioned in the petition, transferred them to defendant La Coste, and they were located upon the land mentioned in the petition, and patented in the name of La Coste, as assignee. With all these colonists Castro had contracts signed in Europe, in the form of the blank attached to the petition, which was as follows: (omitting the preamble, which recited particulars of Castro's contract with the Government:)

In consequence, the undersigned has entered into the following agreement, to wit:—

ART. 1ST. Mr. Castro, by virtue of the powers vested in him by the Government of Texas, as detailed in the preamble, grants by these presents to Mr. —— six hundred and forty acres of land, measure of Texas, within the above mentioned limits, and on the section to be chosen by the Director whom Mr. Castro has established at the town of Castroville, 25 miles from San Antonio.

ART. 2D. Mr. —— accepts this grant, and engages to take possession of the land within one year; to build a hut or house thereon; to fence and bring under cultivation at least fifteen acres of land, agreeably to the provisions of the deed of grant, and, further, to hold the above mentioned quantity of fifteen acres of land under cultivation during the space of three years from date of his taking possession thereof; as also to pay the surveyor's dues, amounting to —— dollars.

ART. 3D. The present agreement shall be transferable by sim-

ple indorsement, and the holder shall be entitled to all the rights, privileges and immunities, and subject to all the obligations, therein set forth.

ART. 4TH. Mr. Castro acknowledges the receipt of the sum of ——, deposited by Mr. —— as a guarantee for the fulfilment, on his part, of the conditions of the present agreement.

This sum will be repaid to the colonist, on production of the present deed, at his residence on the lands of the grant, as soon as he shall have fulfilled *in toto* the conditions imposed by the first clause of the second Article; but should the colonist fail to fulfil the same within the space of one year, the present agreement shall be considered null and void, and the said sum of —— shall be forfeited to Mr. Castro.

ART. 5TH. If any difficulty should arise as to the execution or interpretation of the present contract, the undersigned agree to refer the same to the local authorities for their decision.

[Signature of Mr. Castro.]          [Signature of colonist.]

And in virtue of the law of the Republic of Texas, of 4th February, 1841, which authorizes me to dispose of one-half of the grant above mentioned, I hereby, in consideration of the preference shown me, of the expenses incurred or hereafter to be incurred by Mr. Castro, of the facilities which he has afforded me for my passage, transfer and convey to him, by these presents, one-half of the lands mentioned in this contract, to wit: 320 acres, to be by him retained for his sole use and benefit, undertaking on my part to fulfil all the obligations of the agreement.                    [Signature of colonist.]

Bauer and Schonen, in consideration of the premises, transferred half their certificates to Castro, the former on the 15th of February, 1851, and the latter on the 15th of March of same year. The transfers spoke of the land as to be afterwards located. Seven others, in 1848, in consideration of the premises, transferred to Castro one-half the lands to which they were entitled as colonists; they had made their selections under the colonial law, and the particular land was described. It was different from that on which the certificates of said parties were afterwards located and patented.

The other colonists mentioned never executed any instrument except the contract executed in Europe. The certificates issued to the colonists by the Commissioner under the Act of 1850 were as follows:—

STATE OF TEXAS, *County of Medina.*      No. 171. Acres 320.

This is to certify that Gregory Herman appeared before me, Commissioner appointed by virtue of "An Act to perfect land titles in Castro's colony," and made oath that he was introduced into Texas previous to the 15th day of February, A. D. 1847, by H. Castro, according to a contract signed between them in virtue of the colonization contract of said H. Castro with the Government of Texas, and also proved the facts by two respectable witnesses; and the said Gregory Herman being a single man over 17 years of age at the time of his emigration, is entitled to three hundred and twenty acres of land, to be surveyed out of any vacant lands within the limits of said colony.

[SEAL.]      Given under my hand and official seal, at Castroville, this 17th day of February, A. D. 1851.

J. M. CAROLAN, Com. C. C.

The patents to La Coste were put in evidence by plaintiff.

Dr. Cupples, sworn for plaintiff, stated that he had been an agent of Castro; that he was well acquainted with his colony affairs.   Came to Texas in 1844.   Castro had contracts with all his colonists; they were all alike, except with those who came in the first expedition, who were not required to convey any land to Castro.   None of the parties mentioned in this suit were of the first expedition.   By their contracts, the colonists agreed to convey to Castro one-half the land they should receive as colonists; the consideration was their being accepted as colonists, and in further consideration of the time, labor and expense incurred by Castro in bringing them to the country.   The contract with the Government, as far as it was carried out, was carried out by Castro.   Jassaud never took any interest in it.   Castro has always publicly asserted and said he had an interest in the lands of his colonists by virtue of his contracts with them.   Defendant Huth was a colonist of Castro, and conveyed to him one-half his land.   Huth knew of the claim of Castro to one-half his colonists' lands.   He and witness had frequently conversed together about it before the certificates were issued.

*Cross-examined.*—Witness stated that he did not know if any improvements were made by Bauer on the land in Castro's colony.   Chas. Cupples cultivated land there; had twenty acres under fence.   The first emigrants came into Texas in 1843; they sailed from Europe before October.   Witness knew that before October, 1843, two expeditions left for Texas.   Witness visited

the colony land in May, 1845, and there was not a single settler in the colony.    The first settlement made by Castro was west of the Medina river, now Castroville; it is not within the colony. The first settlement on colony land was made in 1846.    In February, 1847, there were 15 or 18 families settled at Quihi. Vandenburg and D'hanis were settled in 1846.    There were in February, 1847, 10 families at D'hanis, and 15 or 16 at Vandenburg.    In February, 1847, there were not more than 140 souls in all the colony.    Some of the families had as many as eight children.    Not one person had a field of 15 acres inclosed in the colony in 1845.    In February, 1847, some had their farm lots in cultivation in Vandenburg.    Surveys were made in 1847 and 1848.    Thinks he might safely say there were seventy-five or eighty families settled in colony last of February, 1848.    There were not, under any circumstances, over 150 families.    There were over 600 families introduced by Castro into Texas before the 15th day of February, 1847; many of them remained in Galveston.    Premium certificates for land were issued to him for over 600 families.    The reason why the first colonists did not go on the land was because John C. Hays, the Surveyor of Bexar county, whose duty it was to survey the colony and lands, refused to make the surveys or point out the lands for the colonists, giving as a reason for his refusal to make the surveys that the Indians were so bad that it would be unsafe either for the Surveyor or colonists to go out there.

Theodore Gentils, one of the parties mentioned in petition, sworn for plaintiff, stated that he came to the country as a colonist of Castro, 5th March, 1844; stopped some time at Galveston; about a hundred and fifty emigrants came over with him. There were two expeditions came over before him.    Witness had a contract made with Castro in Europe; it was like the one shown the Court.    Witness agreed to give Castro half his land; was always satisfied with the way Castro complied with his part of the contract; and when he (witness) sold his certificate, it was to Poinsard, and only sold his interest in the certificate.    Thinks Poinsard knew of Castro's claim.    Castro always claimed one-half the land of his colonists, and always publicly asserted his claim.    Poinsard was a colonist.    Castro had contracts with all his colonists; they were all alike, except those of the first expedition were not required to give him any land.    Witness was an agent of Castro, to put the colonists on the land.    Many of them went out to look at the land, and did not like it, and did not settle

there then. Castro always sought to get one-half the land, and did get it of most of his colonists. Witness went to colony in summer of 1845. The lands were surveyed in 1845; in latter part of 1847 there were about 15 or 18 families at Quihi; D'hanis had 10 families; Vandenburg had more than either of them. There were in all the colony, in February, 1847, not more than 130 or 140 souls. Don't know how not one person had a field of 15 acres inclosed in February, 1847. Some had their farm lots in cultivation in Vandenburg in February, 1847. Surveys of colonists were made in 1847 and 1848.

John M. Carolan, sworn by plaintiff, was Commissioner for Castro's colony. The first time witness went to issue certificates at Castroville, Dr. Cupples, Mr. Huth, and other leading men, asserted Castro had no right or claim. The discussion was as to Castro's right to point out lands, and compel the colonists to select those lands. The most intelligent of the colonists denied that Castro had any right whatever to the lands. I wrote to the Attorney-General, and obtained his opinion; which was, to let the colonists select where they pleased.

Russell Howard, sworn by plaintiff. Castro has always asserted a claim to one-half the colony lands; he has made the claim in my presence often.

Lorenzo Castro, sworn by plaintiff. Henry Castro has always claimed one-half the land granted to his colonists. Castro had a conversation with La Coste (defendant) in 1851, in regard to the half of the land. He had a knowledge of Castro's claim. Defendant Huth was a colonist, and transferred to Castro. Huth bought most of the certificates mentioned; so witness heard. Witness was told so, but not by La Coste or Huth.

H. M. Lewis, sworn for plaintiff, says: I attempted to purchase of La Coste the patents issued to him as assignee of the colonists of Castro's colony. He said he only owned a half interest, Huth the other. I went to Castroville to buy Castro's interest, but I did not buy. La Coste had at that time notice of Castro's claim. This was in 1854. He spoke as if he always had that notice.

F. Giraud, sworn by plaintiff, said he has had two conversations with La Coste about Castro's claim, one just before and one after suit brought. La Coste said he was going to stand the suit, as it was a test suit. He said nothing about not having notice of Castro's claim, or of having previous notice.

It was admitted that the land described in petition was the

land patented to La Coste, as assignee of colonists mentioned, and that Huth owned a half interest therein. It was proved that all the certificates, by virtue of which the patents were issued, were issued by J. M. Carolan, under the Act of the Legislature of 22d January, 1850, to perfect land titles in Castro's colony.

The Court charged the jury as follows :—

1st. To entitle plaintiff, as the assignee of the contractor Castro, to recover in this suit, you must be satisfied, from the evidence, first, that these certificates were granted to the colonists by reason of a compliance by Castro with the terms of the contract, marked Z, on or before the 15th of February, 1847, and not as a relief measure in favor of colonists and contractor by reason of the law of 22d January, 1850 ; and secondly, that La Coste had, before the date of his purchase, (which can be seen by an inspection of the patents in evidence,) notice of Castro's interest in the certificates or lands described by plaintiff in his petition.

2d. If, however, you believe La Coste purchased the certificates or land claimed by plaintiff, without notice of plaintiff's claim, and for a valuable consideration, then you will find a verdict for the defendants.

3d. If you should not believe, from the evidence, that the defendant La Coste is an innocent purchaser, without notice, you will, if you believe, from the evidence, that Castro had failed to carry out his contract by the 15th of February, 1847, find a verdict for the defendants.

4th. The transfer of lands in Bexar county, recorded in the county of Medina, is not in itself notice to a purchaser living in Bexar county.

5th. Notice after a purchase made, and payment thereon, cannot affect the right previously acquired by such purchaser.

6th. If you find in favor of the defendants by reason of Castro's having acquired no interest, by a failure on his part to carry out the contract between himself and the Government, on the strength of which the colonists transferred to him the interest now claimed—

7th. Then you will inquire, Did La Coste purchase the interest of Henry Schonen without notice ? If you believe he had notice of Castro's conveyance before his purchase, you will find in favor of plaintiff for one-half of the land described in the patent for Schonen's land ; otherwise, you will find for the defendants.

8th. The assertion of Castro's claim is not notice to La Coste, unless such claim was made in La Coste's presence or hearing.

The following instructions were requested by the plaintiff, and refused by the Court:—

1st. That if, from the evidence, they believe that defendant Huth had notice of Castro's claim upon the land before La Coste purchased, then La Coste, as well as Huth, are chargeable with notice.

2d. If, from the evidence, the jury believe that La Coste or Huth had any notice of Castro's claim, that would put them, or either of them, upon inquiry, and they have failed to make that inquiry, then they, or either of them, is chargeable with notice.

Verdict for defendants for all the land claimed, except the one-half of the land patented to La Coste, as assignee of Henry Schonen, which the jury found for plaintiff, less the expenses of procuring the patent. Judgment accordingly. Motion for new trial overruled, &c.

*Hewitt & Newton,* for appellant. Among others these were the main issues put to the jury by the Court, in its instructions, and they were the ones relied upon by defendants :—

First. The jury were to find whether the Act of 15th February, 1850, was a relief Act or not. (Hart. Dig. 699.)

Second. The jury were to find whether La Coste had notice of Castro's claim upon the land in controversy.

Third. Whether Castro had complied with his contract with the late Republic. Of these instructions we particularly complain, and first whether the Act of 1850 was a relief Act or not, was a question to be determined by the Court, and not by the jury. It was a question of law. (Hart. Dig. Art. 753.) And until the law was decided, the jury could not act intelligently upon the evidence or apply it to the law.

As to the question of notice we complain, because the proof is that Huth was equally interested in the land with La Coste; and the instructions should have embraced him in its terms. It would have made the proof of notice that much the stronger. There are other enunciations of the Court upon the law of notice, of which we complain, as it does not appear from the statement of facts that they have any application to the case at bar, and the jury might have been misled by them.

As to the third matter of inquiry whether Castro had com-

plied with the terms of his contract with the Government. This instruction might have been proper enough, had the Court decided upon the character of the law of 1850, and that it was technically a relief Act. Then the inquiry might have been made as to Castro's compliance, under the Ordinance attached to the Constitution. But if the Act was passed by the Legislature in discharge of its obligation to Castro and his colonists, on account of their compliance with their obligations to the Government, then the instruction was erroneous. For then there could be no inquiry as to whether Castro had complied or failed to comply with his contract with the Government. For that question was decided by the law itself, and both State and Colonist were estopped from going behind it.

A combination of all these questions brings us to the real merits of the case. And first : The object or intention of the Government was to procure good citizens, and the settlement of the public domain. Was this object attained ? Over six hundred families were introduced into Texas under the contract before 15th February, 1847. This was the number required, and so far there was a compliance. Did they enter upon and cultivate the land as required, before they obtained title ? They did not. But who waived the necessity of it ? The Government. Was this Mr. Castro's fault ? Certainly not, for he had not been consulted in the matter, and more than that, he had been faithful to the Government in all his agreements with the colonists to provide for the settlement and cultivation of the land. Then if the State did this, Castro is not to blame and ought not to suffer for it. The State has gained all she desired, through the instrumentality of Mr. Castro, and feeling that he was entitled to his compensation passed the Act of 1850, in discharge of her obligations to him.

But it is contended that the Ordinance prohibits the State from acknowledging a compliance with the contract on the part of the contractors. In this we cannot agree, for the sovereign people would not do so unjust a thing. And may we not safely conclude it was the intention of the Ordinance, that when rights did exist they should be acknowledged and their obligation discharged. This was the interpretation the Legislature placed upon it by the passage of the Act of 1850, evidenced by its caption and all its Sections ; and the conclusion is the more satisfactory, when we compare this Act with the other Acts of the same Legislature in regard to colonies, and see how careful

it was to draw a distinction between relief Acts and Acts in discharge of an obligation. (See Hart. Dig. pages 682, 686 and 702 compared with page 699 ; 3 Hawks. 520 ; Sedg. on Stat. and Cons. Law, 245 to 248 ; Domat's Rule, Id. 285.)

If we are correct in these conclusions, we may then inquire into the obligations of the colonists to Castro.

It is in proof that Castro had agreements or contracts with all his colonists. Castro complied with his part of the contract—indeed it is not denied by defendants. Through his merits and instrumentality and his alone the colonists have received the land promised them, as is evidenced by the law perfecting their titles, (Hart. Dig. page 699,) the oath they had to make and did make, and corroborated by two witnesses, the certificate they received, and the patent. Surely this is sufficient to show a compliance on the part of Castro. If the colonists by the Act of 1850 have been relieved from some of the burdens of their contract, such as occupation, and cultivation and length of residence, &c., it ought not in reason or justice lessen their obligations ; and their vendees are liable to the same obligation, unless relieved by want of notice. This question is amply answered by the witnesses, strengthened by the recitals in the laws authorizing the contracts, the recitals in the certificates themselves and in the patents.

*I. A. & G. W. Paschal,* for appellees. I. There being no bill of exceptions, showing that there was any objection to the charge of the Court, it is not now before this Court for revision. (Crane's Case, 5 Peters ; Carver v. Jackson, 4 Id. 1 ; Converse v. McKee, 14 Tex. R. 30 ; Thatcher v. Mills, Id. 13.)

II. Castro failed to perform his contract, and forfeited all right under it ; and there being no legal equity either in him or in the colonists, the Act of 1850 conveyed a pure donation.

III. Appellant admits the constitutional effect of the Ordinance, which gave the defendants the right to plead the failure of compliance by Castro, contrary to the general principle which prevents a private person from pleading a forfeiture which the Government does not choose to enforce.

IV. The agreements of 1848, with some of the colonists, did not operate upon the lands acquired by them under the Act of 1850, for the same reason which exempted them from the agreements signed in Europe.

V. The charge of the Court on the subject of notice was more

Causici v. La Coste.

favorable to plaintiff than the law justified, and the jury gave him more than by law he was entitled to.

WHEELER, J.    It is objected to the charge of the Court, that the Judge referred to the decision of the jury, the question whether the Act of the 22d of January, 1850, was a relief law. We do not so understand it.    The Court told the jury, in effect, that, to entitle the plaintiff to recover, the certificates must have been granted to the colonists, by reason of a compliance by the contractor with his contract, and not by virtue of the Act of the 22d of January, 1850. (See 1st and 3d Inst.)  It is of very little consequence by what name the Act of 1850 is called.    The material question is, whether the legal rights of the colonists depend upon that law, or the colonization contract and laws in force during its subsistence.    The contracts between the contractor and the colonists were made in anticipation of rights to land thereafter to be acquired by means of a compliance with the colonization contract and the laws under which it was made.   At the time of the making of these contracts, the subject matter of them, titles to land, had no legal existence.    It was by virtue of acts thereafter to be performed by the parties, that they were to be acquired, and become invested with the properties of legal rights.    At that time everything was in expectancy.    The only right the parties then had was the right to perform their contract with the Government, and reap the benefits it was intended to confer.    But whether in fact they should ever enjoy the anticipated benefits, depended upon the contingency of their performance of their contract to colonize, and become colonists and inhabitants within the limits assigned, agreeably to the terms of the contract and law of colonization.    It abundantly appears, from the evidence, that the contract was never performed.    The time appointed for its performance expired, and with it the parties lost the only legal right they ever had under it, that of carrying it into complete execution according to its provisions. After the 15th of February, 1847, that right no longer remained.    By reason of their non-performance, they ceased to have any longer any legal right; that is, such a right as the law will recognize, under or by virtue of the contract with the Government.    They had, it is true, the same imperfect right which all have to appeal to the justice, generosity and magnanimity of the Government, which the latter may exercise through its legislative department; but they had no perfect right; none which a Court

of Justice can recognize; which is what is understood by the term legal right. The principal contract, and all the anticipated fruits of it, in the way of legal rights, had become extinct, and so remained. The principal contract having thus fallen, all the other subordinate contracts of the parties, which were dependent upon, fell with it. And thus the matter stood at the passage of the Act of the 22d of January, 1850. The meritorious considerations which induced the Legislature to pass that Act, were not legal equities, so to speak; that is, they were not equities of which any Court of law or equity could take cognizance. In a legal point of view, therefore, the Act of 1850 must be regarded as conferring a pure donation. It was based, doubtless, on what were justly deemed highly meritorious considerations, of justice and policy. But the benefits conferred were not the less, in a legal point of view, a free gift; for the recipients of the legislative bounty had no legal claim upon the Government. It matters not that they were ever so meritorious; every similar act of governmental favor is supposed to have for its motive a meritorious cause; but unless it be in discharge of some obligation of the Government, which the law recognizes, it cannot be deemed, in a legal sense, anything but an act of sovereign grace and bounty on the part of the political authority. The Act of 1850 did not, nor could it, resuscitate these fallen contracts. They remain, as they were upon the failure of the parties to perform them, on the 15th of February, 1847, incapable of being enforced. (Ordinance of 1845.) The Act of 1850 does not undertake to afford, nor can it afford, aid to the contractor to enforce the specific performance of contracts with his colonists, which the former had lost all right to claim the performance of by his failure to perform on his part. Doubtless, if he expended money for their benefit, at their instance, or if he rendered them valuable services, they were liable to make restitution or compensation. But they are not bound specifically to perform a contract to convey land, their ability to do which was made to depend on his performance of precedent acts, which he has failed to perform. We conclude there was no error in the charge of the Court in the matters complained of.

In respect to the land contracted to be conveyed after the right was acquired under the Act of 1850, it is not perceived that there was any erroneous ruling adversely to the appellant. We are of opinion that there is no error in the judgment, and it is affirmed.

Judgment affirmed.