## J. B. GOLDSMITH v. R. HERNDON AND ANOTHER.

1. A headright certificate which was issued under the joint resolution of May 24, 1838, (Hartley's Digest, Art. 1895,) to the "heirs or legal representatives" of a soldier who fell with Fannin at Goliad, in March, 1836, was not a gratuity or donation to such heirs or legal representatives, but was assets of the estate of the deceased soldier, and subject to be sold by his administrator for the payment of his debts.

2. The twenty-ninth section of the act of December 14, 1837, (Paschal's Digest, Art. 4150,) is believed to be only declaratory of the rights secured to citizens by the tenth section of the general provisions of the Constitution of the Republic, and to be a legislative indication of the persons considered citizens within the meaning of that section; and the joint resolution of May 24, 1838, (Hartley's Digest, Art. 1895,) conferred no additional rights upon the heirs or legal representatives of

XXXIII—45

" those who fell while under the command of or with Fannin, Travis, Grant and Johnson, in the spring of 1836," but simply recognized pre-existing rights and prescribed evidence which should be sufficient to establish them. So, also, the act of February 11, 1850, (Hartley's Digest, Art. 2323,) was only a re-acknowledgment of the pre-existing rights of those who fell with the commanders named, and a provision for the issuance of certificates to their heirs.

3. In this case judicial cognizance is taken of the historical fact that the First Georgia Battalion was in Texas prior to the adoption of the Constitution of the Republic.

Appeal from Johnson. Tried below before the Hon. J. J. Good.

This cause has been ably and persistently contested. The present is the third decision of it by this court, re-hearings having been obtained after the first and second determinations of it. Upon each trial of it, however, the result has been the same, although Mr. Justice Lindsay, upon the second hearing of the case, delivered an able dissenting opinion.

Goldsmith, the appellant, was the plaintiff below. He derives his title from the sale made by the administrator, which was made early in 1840, before the passage of the act of January 14, 1841, (Paschal's Digest, Art. 1399,) which prohibited sales of deceased soldiers' lands without consent of the heirs.

The appellees claimed under deeds made to them in 1859 by the heirs of Slater, the deceased soldier. It was admitted that these heirs were aliens at the time of the grant, and it does not appear that they ever became citizens of Texas.

A jury was waived in the court below and the cause submitted to the court, by whom judgment was rendered for the defendants, and the plaintiff appealed.

Walton & De Normandie, for the appellant, cited the provisions of the Constitution of the Republic and of the several enactments pertinent to the question, and also the cases of Allen v.

Clark, 21 Texas, 404; Harris v. Graves, 26 Texas, 577, and Soye v. Maverick, 18 Texas, 100.

*Amzi Bradshaw*, and *Hancock & West*, for the appellees, cited Warnell v. Finch, 15 Texas, 163; Eastland v. Lester, 15 Texas, 100; Owen v. Shaw, 20 Texas, 81; Hornsby v. Bacon, 20 Texas, 556.

OGDEN, J.—This cause has been twice decided by this court, and a rehearing granted each time, and the cause is now submitted on additional argument and brief, both for appellant and appellee; and after a careful examination of the record and all the authorities at command, bearing upon the single question which we deem material to settle the rights of the parties, we have been unable to discover in either of the able and well digested opinions of this court, delivered in this cause on former occasions, any error sufficient to authorize a change in the general conclusion arrived at in either of those opinions.

That there is but one question presented in this cause for the decision of the court, is patent upon the face of the record, and admitted by counsel for appellant and appellee, namely: Was the headright certificate, for one-third of a league of land, issued by the board of land commissioners for Harrisburg county, on the twenty-sixth day of September, 1839, to the heirs of Randolph Slater, assets in the hands of the administrator, and subject to the payment of the debts of the deceased? It is not denied that if the certificate issued to the heirs of Slater, as his heirs, or issued to the heirs in the right of Slater, or issued in the discharge of some obligation due from the government to Slater during his life, then it became assets in the hands of Slater's administrator, and subject to his legal obligations. But if the grant was made directly to the heirs of Slater, as a voluntary gratuity or donation, because of the heroic deeds or

great sufferings of the ancestor, or because of the loss sustained by the heirs, or for any other cause, then it became the absolute property of the heirs, and not assets of the estate. On an examination of the facts of this cause, we learn that Randolph Slater, to whose heirs the certificate now in question was issued, was a soldier under Col. J. W. Fannin, Jr., and was massacred by the Mexicans on the last of March, 1836, several days subsequent to the adoption of the Constitution of the Republic of Texas. That C. W. Buckley was, in 1839, appointed administrator of the estate of the deceased; that he, as administrator, obtained the certificate in question, which was issued to the heirs of Slater; that he sold the same, and that the appellant, John B. Goldsmith, is the owner by transfer of the administrator's title; and further, that appellees hold the land on which said certificate was located, by transfer of title directly from the heirs of Slater, made subsequent to the administrator's sale. It therefore becomes important to know under what law, or authority of law, the certificate was issued, in order to determine to whom and for whom the same was issued. Article 15 of the Plan and Powers of the Provisional Government of Texas, adopted November 13, 1835, provides that "all persons now in Texas and performing the duties of a citizen, who have not acquired their quantum of land, shall be entitled to the benefits of the laws of colonization under which they emigrated; and all persons who may emigrate to Texas during her conflict for constitutional liberty, and perform the duties of citizens, shall also receive the benefits of the law under which they emigrated." This article had reference directly to the emigrant himself, and declared that he, and not his heirs, should receive the quantum of land. It is immaterial whether the colonization laws were in force or not on the adoption of the declaration of the consultation, as the fifteenth article clearly shows an acknowledgment of a right and a recognition of citizenship. It is a historical fact, that may be judicially recognized, that the First Georgia

Battalion, of which Slater was a member, was in Texas before the adoption of the Constitution of the Republic of Texas, and the facts in this cause show that he was bravely performing the duties of a citizen, and was therefore entitled to receive the quantity of land, which was subsequently issued to his heirs, under the Constitution of the Republic. On the seventeenth day of March, 1836, three days before the surrender of Fannin and his men, the Constitution of the Republic of Texas was adopted; and the tenth section of that document provides " that all persons who were residing in Texas on the day of the declaration of independence shall be considered citizens of the Republic of Texas, and entitled to all the privileges as such. All citizens now living in Texas, who have not received their portion of land in like manner as colonists, shall he entitled to their land in the following proportion and manner: Every head of a family shall be entitled to one league and labor of land, and every single man of the age of seventeen and upwards shall be entitled to one-third part of a league of land."

The declaration of independence was made on the second of March, 1836, only nineteen days before the surrender of Fannin at Goliad. Slater was a soldier in Fannin's battalion, and the presumption is therefore very strong that he was in Texas on the day of the declaration of independence, and entitled to land under the authority of that Constitution as a citizen. But there can be no doubt that he was living in Texas before and at the time of the adoption of the Constitution, and was fighting for Texas liberty, and was clearly entitled to a grant of land under that instrument at the time of his death. This was clearly the view taken by the Congress of the Republic; for, in 1837, an act was passed fully recognizing the rights of volunteers, whether residents, non-residents or aliens, which declared " that every volunteer who arrived in the Republic after the second of March, 1836, and before the first of August, 1836, and has received, or may hereafter receive,

an honorable discharge, and has taken the oath prescribed by the Constitution, or who may have died, shall receive the quantity of land by this act secured to original colonists." This act is believed to be only declaratory of the rights secured by the Constitution, and an indication of who were to be considered citizens under that instrument. The joint resolution of the Congress in 1838, (Hart. Dig., 596,) conferred no additional rights upon the heirs, but simply prescribes the evidence necessary to establish those rights ; and in doing so Congress clearly recognized the pre-existing rights of those who fell with Fannin, as that resolution directed that the certificate might be granted to the heirs or legal representatives of those who fell with Fannin, Travis, Grant and Johnson. But it is contended that "legal representatives," as used in that resolution, has a peculiar signification, and means only heirs or kin. It is believed that this construction would be in violation of the plainest meaning of language, and force the resolution to utter an absurdity by saying that the grant should issue to the heirs, or heirs or kin, of the deceased.

We are unable to come to any other conclusion than that the Congress intended to facilitate the discharge of a meritorious debt, due to the deceased during his life, by directing that the certificate should issue to his estate. The act of the Legislature passed in 1850, (Hart. Dig, 705,) is believed to be but a re-acknowledgment of the pre-existing rights of those who fell with Fannin and others, and an act to provide for the issuance of certificates to the heirs. The peculiarity of the language of that act is worthy of notice. It provides for the issuance of certificates in *right* of those who were heads of families, and in *right* of those who were single men. If this statute be a correct interpretation of the object and intent of those grants, then the certificates could not have been intended as a gratuity or donation to the heirs, nor could they have issued in right of the heirs. The quantity of the land granted and the character of the grant (it being a headright) precludes the hypo-

thesis of a donation or a grant directly to alien heirs. The authorities granting the land are supposed to have known the law and the rights of the applicant; and we are not disposed at this late day to call in question their acts, without special allegation and proof impeaching the same.

From this review of the cause before us, we are forced to the conclusion that the certificate issued to the heirs of Randolph Slater by the board of land commissioners of Harrisburg county, in 1839, was for a headright to which Slater was entitled during his lifetime and at his death, and was therefore assets in the hands of the administrator and subject to the debts of Slater. We are hardly disposed at this time to investigate the question of the legality of the acts of the administrator in making the sale, because of the great lapse of time, and particularly as the evidence discloses the facts that the sale was made by the administrator and the same was confirmed by the probate court; and now this court, in the absence of proof to the contrary, will presume that the sale was made in conformity with the law. Appellant shows a regular transfer of title from the administrator of the estate of Slater to himself, for the land in controversy, and we are of the opinion that his is a good and valid title, and the court below erred in giving judgment for the defendant. The judgment is therefore reversed and reformed in accordance with this opinion.

Reversed and reformed.