THOMAS TODD ET AL. v. BRANCH T. MASTERSON ET AL.

(Case No. 5020.)

1. DONATION CERTIFICATE.— A certificate was issued by the secretary of war of the republic of Texas on the 26th of January, 1846, for six hundred and forty acres, reciting that Wm. C. M. Baker, having engaged in the battle of the Alamo with Col. Travis, was entitled to that amount of donation land,

in accordance with the act of congress of December 21, 1837; that Baker, his heirs, executors and administrators, or their assigns, were entitled to hold the land, but that it could not be sold, alienated, or mortgaged, during the life-time of the party to whom it was granted. In this suit, involving the ownership of land appropriated by that certificate, as between those claiming through deeds from the heirs and those claiming through an administrator's sale made to pay debts of Wm. C. M. Baker, the following acts received construction: Act of December 21, 1837 (Pasch. Dig., 4059–4065); May 24, 1838 (Pasch. Dig., 4068); decree of November 24, 1835 (D. D., 4035); decree of December 5, 1835 (Pasch. Dig., 4037); decree of December 11, 1835 (Pasch. Dig., 4040); joint resolution of November 24, 1836; and the following conclusions were announced:

(1) The right of Baker, unless forfeited by some act of his, to a bounty of at least six hundred and forty acres of land, was fixed by laws in force before the fall of the Alamo, and the object of the act of December 21, 1837, was to confer an additional right on some one after the soldier's death, without reference to what he was entitled to under laws existing at the time of his death.

(2) The act of May 24, 1838, reconciled apparent confusion in former laws as to how certificates should be issued, by declaring, in effect, that certificates of the character being considered should thereafter issue " to the legal representatives in the name of the heirs."

(3) The certificate was a mere gratuity, evidencing the gratitude of the republic for the soldier's sacrifice, the right to which vested in his heirs; it formed no part of his estate, and was not subject to sale by the administrator for the payment of debts.

2. CASES REVIEWED AND DISCUSSED.— Eastland v. Lester, 15 Tex., 100; Ames v. Hubby, 49 Tex., 710, and Rogers v. Kennard, 54 Tex., 35, reviewed; and Soye v. Maverick, 18 Tex., 102; Hubbard v. Horne, 24 Tex., 272; Causici v. La Coste, 20 Tex., 286, and Walton et al. v. Cotton et al., 19 Howard, 357, cited.

APPEAL from Burnet. Tried below before the Hon. W. A. Blackburn.

The opinion sufficiently states the case.

*Fisher & Fisher*, for appellant, that the sale of the certificate under order of the probate court cannot be collaterally attacked, cited: Guilford v. Love, 49 Tex., 715; Brockenborough v. Milton, 55 Tex., 493; Pleasants v. Dunkin, 47 Tex., 353.

That the certificate was assets in the hands of the administrator, they cited: Act of 21st December, 1837 (Pasch. Dig., arts. 4059, 4064); Act of 2d March, 1848 (Pasch. Dig., art. 4066); Hubbard v. Horne, 24 Tex., 270; Ames v. Hubby, 49 Tex., 705; Goldsmith v. Herndon, 33 Tex., 706; Rogers v. Kennard, 54 Tex., 30.

*S. R. Fisher* and *R. H. Ward*, for appellees, that no jurisdiction was in Galveston county, cited: Act of February 5, 1840 (Hart.

Dig., art. 1030); Hearn v. Camp, 18 Tex., 546, 551; Duncan v. Veal, 49 Tex., 611.

That the certificate was not assets in the hands of the administrator, they cited: Arts. 4049, 4064, 4066–4068, 1 Pasch. Dig.; Ames v. Hubby, 49 Tex., 710, distinguishing the case from Goldsmith v. Herndon, 33 Tex., 706, and kindred decisions upon bounty grants. See, too, Rogers v. Kennard, 54 Tex., 35, citing Eastland v. Lester, 15 Tex., 98, commented on in Soye v. Maverick, 18 Tex., 101; McKinney v. Brown, 51 Tex., 97.

Stayton, Associate Justice.— The land in controversy was granted by virtue of the following land certificate:

"No. 1229.                    Republic of Texas.                    640 acres.

" Know all men to whom these presents shall come:

" That Wm. C. M. Baker, having engaged in the battle of the Alamo with Col. Travis, is entitled to six hundred and forty acres of donation land, in accordance with the act of congress passed December 21, 1837. Said Wm. C. M. Baker, his heirs, executors and administrators, or their assigns, are entitled to hold said land, but it cannot be sold, alienated or mortgaged during the life-time of the party to whom it is granted.

" In testimony whereof I have hereunto set my hand, at Austin, this twenty-sixth day of January, 1846.

" W. G. Cook,
" Secretary of War, etc."

The appellees claim through conveyance made by the heir of Wm. C. M. Baker, and the appellants claim through a sale made of the land by the administrator of his estate to satisfy debts. This sale was made in 1851, and in the application for sale it appears that Baker was at the fall of the Alamo, and it appears in the original application for letters of administration that he was a citizen soldier who was there killed.

The court below found that the land was not assets in the hands of the administrator of Baker's estate, and on this ground and on another rendered a judgment in favor of the defendants.

If the first proposition be correct, it is unnecessary to examine the other ground on which the court based its judgment.

The certificate on its face shows that it was issued under the act of December 21, 1837 (Pasch. Dig., 4059–4065); so having issued, it necessarily follows that it was a donation from the republic to some one, based on the fact of the death of Wm. C. M. Baker at the fall of the Alamo, and not provided for by any former law.

The sixth section of the act of December 21, 1837, provides that "all persons . . . who fell at the Alamo under the command of Bowie and Travis shall be entitled," etc.

By the act of May 24, 1838, the secretary of war was directed to issue land warrants to the legal representatives, in the name of the heirs of all persons embraced in the first section of that act, upon the production of satisfactory testimony that the persons whom they represent were among those who fell in either of the two actions named in the act. Pasch. Dig., 4068.

The decree of November 24, 1835 (Pasch. Dig., 4035), provided for bounty land to all non-commissioned officers and privates in the regular army.

The decree of December 5, 1835 (Pasch. Dig., 4037), provided for bounty land to volunteers, and the sixth section of that decree provided that "if any volunteer or volunteers shall die in the service of Texas, then, and in that case, it shall be and is hereby declared that their bounty land shall descend to their heirs and legal representative or representatives, with all the benefits which the said volunteer could have claimed had he been living."

The decree of December 11, 1835 (Pasch. Dig., 4040), provided: "There shall be and there is hereby granted to each volunteer in the army of the people of Texas, his heirs or legal representatives, who may have been or may hereafter be killed in battle, or shall come to his death by sickness or any accident whatever in going to or returning from the volunteer army of the people of Texas, one mile square or six hundred and forty acres of land in Texas."

By joint resolution of November 24, 1836, it was declared that "The provisions of the ordinances granting the lands to volunteers from the United States and elsewhere be so construed as to extend to all who have rendered services as volunteers in the army of the republic of Texas."

The ordinance of December 11, 1835, would no doubt have received the same construction as is given to it and other ordinances by the joint resolution of November 24, 1836, which probably, taken all together, gave bounty to every soldier in the army of Texas, whether they served the full period for which they enlisted, were killed in battle, or came to death by other cause during the period of enlistment.

Lands received under these several ordinances and decrees were strictly bounties, to which rights vested in the enlisted person during his life, by virtue of an enlistment under a law which gave the promise of the government, which became part of the contract of

enlistment.    It would seem to follow, unless the law conferring the bounty gave it a different direction, that land so acquired, coming through a right vested at the time of the death of 'the person for and on account of whose service the bounty was given, would vest in the heir of such person, just as would any other property, subject to the payment of the debts of the ancestor through an administration on his estate.

The certificates which evidenced the rights of persons to land, under the several ordinances and decrees referred to, were termed "bounty warrants," as were the lands granted termed "bounty lands" (Pasch. Dig., 4050, 4041, 4057, 4058, 4074, 4079, 1155, 1157), and properly so; for the lands were "a premium offered or given to induce men to enlist into the public service."    An extra compensation offered by the government to those persons who should enlist and faithfully discharge the duties of a soldier in the war then pending.    Abbott's Dictionary.

The reasons for holding that bounty lands constitute a part of the assets of the estate of a deceased person through whom they come, are just as cogent, in the absence of something in the law through which such lands are obtained showing a contrary intention, as in cases of lands acquired as headrights, in the name of heirs, after the death of the ancestor through whom the right to the land comes.

In the one case, as in the other, the right had an existence during the life of, and in favor of, the ancestor, and therefore the thing realized, even after the death of the ancestor, through that right, must constitute a part of the assets of his estate.

So it has been held in cases where headrights to which an ancestor was entitled were taken out after his death, even in the name of his heirs.    Soye v. Maverick, 18 Tex., 101; Allen v. Clark, 21 Tex., 406; Goldsmith v. Herndon, 33 Tex., 707; Hornsby v. Bacon, 20 Tex., 558; Warnell v. Finch, 15 Tex., 165; Marks v. Hill, 46 Tex., 345.

The ordinances and decrees to which we have already referred secured to persons situated as was Wm. C. M. Baker a bounty of at least six hundred and forty acres of land, conditioned only on faithful service until the end of his enlistment; and provided that the death in battle or otherwise, or disability ultimating in a discharge from the service before the expiration of the enlistment of such person, should not divest that right.

This right was the result of contract existing at the time of his death.    It needed no statute after his death to give validity to it. It was a right perfected with his death.

Was the act of December 21, 1837, intended to give a right not given by any former law? Was it passed to perfect or in any way evidence a right which, prior to its passage, had any existence whatever?

The act evidently referred to soldiers of the regular or volunteer army who participated in the battle of San Jacinto or were prevented from so doing by the facts stated in the act; to like persons who entered Bexar at the designated time and actually took part in its reduction; to the same class of persons who were in the action of March 19, 1836, under the commands of Colonels Fannin and Ward, and to those who fell at the Alamo under the command of Bowie and Travis.

As before said, the right of this class of persons, unless forfeited for failure in soldierly duty, to a bounty of at least six hundred and forty acres of land, was fixed by laws and contracts in force long prior to the fall of the Alamo; and the sole purpose of the act in question, passed long afterwards, was to confer an additional right on some one for a like quantity of land, based on the sole fact of the death of the soldier, and without reference to any right which the soldier may have had for services under laws existing at the time of his death.

The act, in some of its provisions securing a benefit to persons then living, and in others to other persons on account of the prior deaths of those persons who fell in fighting the battles of the country, in its directions in reference to the manner of issuance of the certificates, and as to the persons who were intended to be benefited by it, were not clear.

The act of May 24, 1838, however, draws the distinction in this respect between the two classes of beneficiaries, and declares, in effect, that the certificates which were to be issued on account of the deaths of persons under Fannin and Ward, or under Bowie and Travis, should be issued "to the legal representatives, in the name of the heirs."

The act of December 21, 1837, could not in the nature of things have been passed to evidence a right existing under former laws; for its language evidences no such intention, and laws were then in force not only vesting the right to bounty lands for services, but also providing for the issuance of the proper evidence of such right. Pasch. Dig., 4050, 4057.

Under laws in existence prior to the death of Wm. C. M. Baker, a certificate for one thousand two hundred and eighty acres of bounty land was issued, and in addition thereto, under the act of

December 21, 1837, the donation certificate, under which the land in controversy was granted, was issued. This was in accordance with the practices of the several departments of the government from early times.

At the time of the death of Wm. C. M. Baker he had no existing right whatever to the land contemplated by the act of December 21, 1837; his services were to be otherwise compensated; as to him, there neither was contract, nor consideration to support a contract, on which he could have asserted claim; the act bestowed a mere gratuity, the basis for and right to which arose long after his death, and the act itself conferred but a donation expressive of a nation's gratitude; and the only question is: For whose benefit was the donation made?

Baker had died in the service of his country, and to him the donation could not be of any value.

The record bears evidence that he must have been the head of a family; perhaps left a widow, children or other heirs, who could be substantially benefited by the donation.

Under such facts, in the absence of something in the act evidencing an intention to make the land donated a part of the estate of Baker, we are of the opinion that the donation, a mere gratuity from the government, vested in his heirs, and that it constituted no part of his estate.

There is nothing in the legislation had upon the subject evidencing a contrary intention; in fact, the last legislation had in reference to these donations provides that the commissioner of claims "may also issue to said heirs bounty and donation warrants upon the same proof that authorizes the issuance of headright certificates," etc. Pasch. Dig., 1160.

The views which we entertain of the act in question are believed to be in harmony with the decisions of this and other courts upon similar statutes.

By the act of February 9, 1850, it was provided "that all volunteers captured at Mier and at Santa Fe by the Mexican forces shall be entitled to receive pay at the rate of $22.50 per month, from the respective times of their mustering into service until one month after the time at which the main bodies of said volunteers were released by the Mexican government; and it shall be the duty of the auditor and comptroller to issue to each of said volunteers, or his heirs or representatives claiming the same, a certificate for the amount to which he may be entitled under the provisions of this act, and the further sum of $65 to each of said volunteers as com-

pensation for the loss of his horse, arms and accoutrements, to be added to the amount of pay aforesaid, and included in said certificate, which certificate shall be issued to the person or persons entitled to the same." Hart. Dig., 2712.

In the case of Eastland v. Lester, 15 Tex., 100, it appeared that under that act the sum of $2,273 had come into the hands of the executor of Eastland's will. Eastland died prior to the act of February 9, 1850, and we know historically that he was one of the seventeen executed at *Hacienda Salado* on March 25, 1843. A creditor of Eastland sought to have the money in the hands of the executor inventoried as a part of his estate, and this was resisted by the widow of Eastland, but the district court directed that the money be placed on the inventory.

In disposing of the case on appeal it was said: "Nor is it believed that the money, being called pay, can control the meaning. If it was a gratuity on the part of the state, its being called payment for services cannot change the character of the donation so as to make it a payment for services for which the party had a legal claim against the state. That it was a voluntary gratuity on the part of the state is clear from the fact that the right rests solely on the act passed for the relief of the persons described therein, and did not rest upon any express or implied contract before the service was rendered. . . . The circumstances that invoked the voluntary gratuity of the state furnish strong grounds to believe that the legislature never intended that the money so bestowed should ever receive a direction that would deprive the beneficiary, if living, or his heirs, if he was dead, of its personal enjoyment. These circumstances now form a part of the history of our country. The gallantry and long and severe suffering by close and cruel confinement in the loathsome Mexican prisons, although furnishing the sufferers with no legal claim for compensation, made an irresistible appeal to the country's liberality, and it is natural, and more in accordance with this exercise of generosity, that the sufferer himself, and not his previous creditor, should enjoy the liberality so bestowed. Hence, they first directed that it should be given to the party himself. But many had sunk under the hardships inflicted on them, and died in Mexico, and others had been slain by the enemy. They therefore directed that, in such case, the heir should receive it; looking, no doubt, to what was in fact true, that many of those brave men had left in our midst a helpless widow and orphan children without competent means of support. What relief for such persons, if the gratuity allowed to them furnished a fund that the creditor could

take from them? The language of the act, and the circumstances that induced it, are alike repugnant to the construction that it was designed for the creditor's benefit."

The restrictions in the act of December 21, 1837, prohibiting alienation, although afterwards canceled, go far to evidence the fact that it was not the intention of the legislature that the donation should be in any respect for the benefit of creditors of the deceased soldier.

The restriction on the power of the beneficiaries, contemplated by the act, to alienate, could not have any effect whatever, if intended to apply to the deceased persons as the beneficiaries; for they were dead long before the act was passed, and the restriction as to them would have been meaningless; it could not apply to the executors or administrators of the estates of such deceased persons, for as to such persons, such a restriction would defeat the sole purpose for which such representative persons can and do hold property; the restriction on the power of beneficiaries to alienate, in cases like the present, could apply to none others than heirs of the deceased persons, without yielding to a construction which would make a part of the act inoperative. This would be to violate the well settled rules of construction of statutes.

The view which we take of the question is evidently the same as was entertained by this court in the case of Ames v. Hubby, 49 Tex., 710, and in the case of Rogers v. Kennard, 54 Tex., 35.

In the last case named, the land in controversy was located by virtue of a certificate for one thousand nine hundred and twenty acres of land, and, as stated in the opinion of the court, it did not satisfactorily appear under what law it issued. It seems to have issued March 30, 1839, by the secretary of war, and to have recited that it was for service; and to have further recited that the beneficiary named in it was killed at the Alamo. It concluded as follows: "And the said E. Melton, or his heirs, is entitled to hold said land, or to sell, alienate, convey and donate the same, and to exercise all ownership over it."

There is nothing in the statement of the case to indicate that the certificate or any part of it was issued under the act of December 21, 1837, except the simple statement in it that the person to whom it was granted had been killed at the Alamo. There are many things which indicate that it did not issue in whole or in part under that act; not in whole, because for a much larger number of acres than that act gave; not in part, for the certificate did not recite for what it issued, as the law required; and we are not to presume that the officer who issued it failed to do his duty in this respect; the

certificate or warrant, issued before any law was passed canceling the restrictions on the power of alienation (Pasch. Dig., 4066), in express terms recited the existence of such power in the grantee and his heirs; it cannot be presumed that the distinguished officer who issued it would have made any such declaration if issued under the act of December 21, 1837, which in terms withheld such power.

In disposing of the case it was said: "This bounty warrant, we must presume, was issued by virtue of some law or regulation recognizing either an express or implied contract, or pre-existing obligation on the part of the government of Texas, to those gallant soldiers who had enlisted in her armies and had fallen in her defense, and hence under former decisions of this court became assets in the hands of the administrator. . . . It differs from those cases where a gift has been made by the government as a pure donation, generally by special legislation." The following cases bear on the question: Soye *v.* Maverick, 18 Tex., 102; Hubbard *v.* Horne, 24 Tex., 272; Causici *v.* La Coste, 20 Tex., 286; Walton *et al. v.* Cotton *et al.*, 19 How., 357.

This view of the first question presented renders it unnecessary to consider the other question presented by the assignment of error.

The judgment of the court below is affirmed.

Affirmed.

[Opinion delivered May 20, 1884.]