KIRCHER v. MURRAY et al.

(Circuit Court, W. D. Texas, Austin Division. March 21, 1893.)

No. 2,219.

1. ALIENS—NATURALIZATION—HUSBAND AND WIFE.

A citizen of Illinois, who entered the military service of Texas, as a volunteer, in her war of independence, after the adoption on November 7, 1835, by the convention, of the declaration promising citizenship and donations of land to volunteers, and who died in her service in 1836, became a

citizen of Texas, and his wife's citizenship followed his, although she never came to Texas.

**2. DESCENT AND DISTRIBUTION—TEXAS BOUNTY LANDS.**

By an act passed February 13, 1858, the Texas legislature authorized the issuing of a land certificate to such volunteer, by name, and his heirs and assigns, for services rendered in the army. *Held*, that the question of heirship to the land was governed by the law of descent and distribution in force at the time of the volunteer's death.

**8. SAME—COMMUNITY PROPERTY.**

The property acquired under the above grant was the community property of the volunteer and his wife, and not the separate estate of the former. Nixon v. Cattle Co., 19 S. W. Rep. 560, 84 Tex. 408.

**4. SAME—PATENTS—INCEPTION OF TITLE.**

The passage of the above act, granting the certificate, was in fulfillment and discharge of the state's pre-existing obligation to the volunteer; and hence the right to bounty lands did not originate with' the act granting a certificate, but the volunteer's title had its inception during his lifetime, although the patent was issued after his death.

**5. SAME—COMMUNITY PROPERTY—RIGHTS OF SURVIVOR.**

In the absence of debts and all other proper charges against the community estate, upon the death of one of the spouses a one-half interest in the community property vests absolutely in the survivor, and the remaining half passes to the heirs of the deceased.

**6. SAME—EQUITABLE INTEREST.**

The interest which the volunteer's wife acquired in the community property was of an equitable nature, the legal ·title to the whole having passed to the husband. Hill v. Moore, 62 Tex. 610, followed.

**7. SAME—WHO ARE HEIRS—SPANISH LAW.**

Under the Spanish laws in force in Texas in 1836, a wife could not be heir to her husband, and under no circumstances could succeed to his separate property, except to the marital one fourth when necessary as a relief against poverty.

**8. FEDERAL COURTS—LEGAL AND EQUITABLE CAUSES.**

In the federal courts the distinction between legal and equitable proceedings is strictly maintained, and the action of trespass to try title cannot be sustained upon an equitable title, but the party must seek her remedy in a court of equity.

At Law. Action by Augusta Kircher against R. G. Murray and others to recover land. On exception to the answer. Exceptions overruled.

West & Cochran and Floyd McGown, for plaintiff.
D. W. Doom, for defendants.

MAXEY, District Judge. Suit at law in the ordinary form of trespass to try title is brought by plaintiff to recover of defendants 433 acres of land. The questions submitted to the court for determination arise upon exceptions interposed by the plaintiff to the following answer of defendants:

"Now come the defendants in the above-styled cause, and, for answer to the plaintiff's petition, say that plaintiff ought not to recover in this behalf, for that the plaintiff has no title to or right of possession of the land described in her petition, in this: that the land in controversy in this suit was located and surveyed under and by virtue of unlocated balance certificate No. 20/160, being a balance of certificate No. 31/201, which issued on the 20th day of February, 1874, in lieu of certificate No. 224, which issued to Gustavus Bunson on March 14, 1860, upon the certificate of Edward Clark,

commissioner of claims for Texas, dated September 11, 1858, and No 4/13, this certificate being given to Gustavus Bunson in accordance with an act of the legislature of the state of Texas, dated February 13, 1858, which act provides that 'the commissioner of claims be, and he is hereby, authorized to issue the following named land certificates, that is to say: * * * Gustavus Bunson, 960 acres, bounty for service in army, 1835–1836,' etc., and said land was patented to 'Gustavus Bunson, his heirs or assigns,' July 14, 1876. That said Bunson died, intestate and without issue, in Texas, in February, 1836, in the service of the Texas army, under the command of Col. Grant or Johnson, and the plaintiff, Augusta Kircher, was his wife at the time of his death, and had been his wife since 1834; and the plaintiff claims that she is heir at law of said Gustavus Bunson, and inherited his said right acquired as aforesaid to 960 acres bounty lands; and that said bounty land warrant became her property on its issuance, as aforesaid; and that the patent issued thereon, as aforesaid, vested title to the land in controversy in her; but the defendants say that if the plaintiff would have been the heir of said intestate had she been a citizen of Texas or Mexico at the time of said Bunson's death, (which is not admitted, but denied,) that the facts are that Gustavus Bunson was not a citizen of Mexico when plaintiff married in the year 1834; that he was then a resident citizen of the county of St. Clair, in the state of Illinois; and that he left there on, to wit, the ―――― day of September, A. D. 1835, to go to Texas, to offer his services as a surgeon to the Texas revolutionary army, nor was she (the plaintiff) then a citizen of Mexico, but was a citizen and resident of St. Clair county, Ill., and an alien to Mexico and Texas; that she never came to Texas or Mexico, and never was naturalized as a citizen of Texas or Mexico,—wherefore defendants say that, at the time of the death of said Bunson, the plaintiff was an alien as to Mexico and Texas, and was incapable of inheriting the right to land which her husband had acquired by reason of his service and death as a soldier, as hereinbefore stated, and the fact that she ceased to be an alien in 1846, by the annexation of the republic of Texas to the United States of America, she being then, and having been since 1834, a citizen of the state of Illinois, could not operate to confer any right on her as an heir unless she had been qualified to become an heir of Bunson at the time of his death, and when descent, of the right in virtue of which the land is titled, was cast.

"(2) And, further answering in this behalf, the defendants say that if those who were aliens at the time of the death of said Gustavus Bunson, but who would have been his heirs if they had then been citizens of Texas, were entitled to said bounty warrant and the lands located and patented thereby, yet the plaintiff has no title, for that prior to the death of said Gustavus Bunson his father had died, but not his mother, and the said Gustavus Bunson, who died without issue, left surviving him at the time of his death his mother, Charlotte Bunson, and only two brothers, Carl and George, and no half-brother or half-sister or descendants of such; that said Charlotte Bunson and Carl Bunson were citizens of the empire of Germany at the death of Gustavus Bunson, and remained such until their respective deaths; that George Bunson was a citizen of the state of Illinois at the time of the death of Gustavus Bunson, and remained such until his death; that Carl Bunson died April 2, 1839, leaving issue who have ever since remained citizens of the empire of Germany; that Charlotte Bunson died December 2, 1847, leaving George Bunson and the issue of Carl Bunson surviving her; that George Bunson died during the year 1872, leaving issue surviving him, and the defendants have a regular chain of title from all the issue of Carl Bunson and George Bunson down to the defendants,—wherefore the defendants say that the legal title to the land in controversy is vested in them under the patent issued for the land in controversy to Gustavus Bunson; that, under the Spanish law in force in Texas when said Gustavus Bunson died, his surviving wife was not the heir of either the separate property of the husband or his interest in the community property, whether there was issue of the marriage or not. And the defendants further say that, if the right to lands acquired by said Gustavus Bunson was community property between him and his said wife, (which is not admitted, but denied,) that the legal title to the

whole of the land in controversy was vested by said patent in the heirs of Gustavus Bunson, and the plaintiff cannot maintain her cause of action at law on an equitable interest in the land in controversy growing out of her community rights, if any she ever had.

"(3) And the defendants, further answering in this behalf, say that plaintiff ought not to have or maintain her said suit against these defendants because of any interest she may have been entitled to by reason of the fact that she was the wife of Gustavus Bunson, for that she never came to Texas, or set up any claim to the rights acquired by her said husband, and never paid any taxes on the land in controversy, or otherwise gave notice of her claim, and the defendants, more than forty years after the death of said Gustavus Bunson, in good faith and without notice of plaintiff's claim now asserted, and without notice that Gustavus Bunson was ever married, purchased the land in controversy from the said issue of Carl Bunson and the said issue of George Bunson, paying full value therefor, and receiving good and sufficient deeds therefor; that said issue of Carl Bunson and George Bunson were vested with the legal title to the land in controversy by virtue of said patent to the heirs of Gustavus Bunson, and neither said patent nor the bounty land warrant on which it was issued contained any fact which should have put defendants on inquiry as to said Gustavus Bunson, having ever been a married man; that the commissioner of claims of the state of Texas treated said Bunson as a single man, by issuing to his heirs a land head-right certificate for only one third of a league. Wherefore defendants pray that plaintiff should take nothing by her suit, and that defendants should be adjudged to go hence, and recover of the plaintiff all costs in this behalf expended."

The exceptions are as follows:

"(1) It appears from said answer that in February, 1836, when he was killed, Gustavus Bunson was a resident citizen of the republic of Texas, and left surviving him his widow, Augusta (Bunson) Kircher, plaintiff in this suit, whose residence, in contemplation of law, was with her husband, Gustavus Bunson; in the republic of Texas; and, it further appearing from said answer that said Gustavus Bunson left no relations who could take under the Spanish law, his heirs being aliens, the plaintiff in this suit, under the Spanish law, became his heir, and as such is entitled to recover the land in controversy. Wherefore she says that so much of said answer as sets up heirship of defendants and alienage of this plaintiff is insufficient, and ought to be stricken out.

"(2) So much of defendants' answer as sets up that plaintiff's claim is an equitable title ought to be stricken out, because, as appears from said answer, Gustavus Bunson died leaving plaintiff as his surviving wife; and, under the law in force, plaintiff's community interest vested in her absolutely, as a legal title, as much as though she had been an heir, and taken by descent.

"(3) So much of defendants' answer as sets up the plea of innocent purchaser for value, and without notice of plaintiff's title, in behalf of defendants, is insufficient, and ought to be stricken out, because—First. The legal title to the land in controversy is in plaintiff, as the heir of G. Bunson, deceased. Second. If the title to the entire tract is not in plaintiff, then, she having survived her husband, the legal title to one half the land, her community interest therein, prior to his death, vested in her absolutely, and neither the legal nor apparent title was in these defendants. Third. Said defense is enforceable, and can be determined only by the rules applicable to the rights of a bona fide purchaser, as prescribed in courts of equity, and cannot properly be pleaded as a defense upon the law side of the docket of this honorable court."

1. It is elementary law that the plaintiff cannot, in a suit of this character, rely upon the weakness of the title of her adversary, but she must recover, if at all, upon the strength of her own title.

2. The status of heirship, as the question affects the plaintiff and the mother and two surviving brothers of Gustavus Bunson, is fixed

by the laws in force at the date of Gustavus Bunson's death. Their capacity to take as heirs is measured and governed by the laws of descent and distribution in force at that time. Lee v. Smith, 18 Tex. 142; Goodrich v. O'Connor, 52 Tex. 375; Hornsby v. Bacon, 20 Tex. 556.

3. At the date of Gustavus Bunson's death, February, 1836, he should be regarded as a citizen of Texas, under a liberal interpretation applied to the eighth subdivision of the "Declaration of the People of Texas in General Convention Assembled," adopted November 7, 1835. That subdivision is in the following language: "(8) That she will reward, by donations in land, all who volunteer their services in the present struggle, and receive them as citizens." 4 Sayles' St. Tex. p. 138. The averments of the answer are that Bunson left Illinois for Texas in September, 1835, to offer his services as a surgeon in the Texan army, and that he died in the service, in February, 1836. The meaning of the averment plainly is that Bunson was a volunteer in the service of Texas at his death; and the eighth declaration of the general convention should be so construed as to confer upon him the rights of citizenship. Gustavus Bunson being at the date of his death a citizen of Texas, the plaintiff, who was then his wife, was also, in contemplation of law, a citizen of the republic, notwithstanding she resided in Illinois. Republic v. Young, Dall. Dig. 466; Russell v. Randolph, 11 Tex. 460; Clements v. Lacey, 51 Tex. 150.

It is insisted by counsel for the plaintiff that the mother and brothers of Gustavus Bunson, who were aliens at the time of descent cast, and who never in fact became citizens of Texas, were not capable of acquiring by inheritance the estate of Gustavus, because of their alienage; and this contention is supported by Holliman v. Peebles, 1 Tex. 673; Yates v. Iams, 10 Tex. 168; Blythe v. Easterling, 20 Tex. 565; Hornsby v. Bacon, Id. 556; Warnell v. Finch, 15 Tex. 164; McGahan v. Baylor, 32 Tex. 790; McKinney v. Saviego, 18 How. 235; Middleton v. McGrew, 23 How. 45. Contra: Sabriego v. White, 30 Tex. 576, dissenting from McKinney v. Saviego, supra; Hanrick v. Patrick, 119 U. S. 156, 7 Sup. Ct. Rep. 147; Settegast v. Schrimpf, 35 Tex. 323; Andrews v. Spear, 48 Tex. 567; Hanrick v. Hanrick, 54 Tex. 101, 61 Tex. 596, and 63 Tex. 618. See, also, Hammekin v. Clayton, 2 Woods, 336; Williams v. Bennett, (Tex. Civ. App.) 20 S. W. Rep. 856; Phillips v. Moore, 100 U. S. 208; Airhart v. Massieu, 98 U. S. 491. Whether the disposition of a particular case should be controlled by Yates v. Iams and others of that class, or by the later cases cited, as in conflict therewith, involves a problem of difficult solution, when, as in the present case, aliens, who never become citizens of Texas, claim under a volunteer soldier, who died in the service prior to the adoption of the constitution of the republic, March 17, 1836, and previous to the Declaration of Independence, March 2, of that year. The conclusion reached by the court, however, on other vital issues of the present controversy, combined with the admitted principle that the plaintiff must maintain her cause on the inherent strength of her own title, whether that of defendants be valid or void, renders it unnecessary to pass definitely upon the question in this suit; but my inclination is in the direction of holding that the mother

and brothers of Bunson should not be debarred from the inheritance simply because they were aliens.

4. As a citizen of Texas and the wife of Gustavus Bunson, what interest did plaintiff acquire in the land in controversy? Before giving a direct answer to this question, the true character of the property itself must be determined. Was it the community property of Bunson and wife, or did it form part of Bunson's separate estate? The certificate which issued to Bunson is known as and termed a "bounty warrant," and the land surveyed and patented by virtue thereof as "bounty land." Todd v. Masterson, 61 Tex. 622. The act of 1858, in terms, authorized, as before observed, a certificate to issue to Bunson for "960 acres bounty, for service in 1836." The passage of the act of 1858 was in fulfillment and discharge of a pre-existing obligation resting upon the state in virtue of laws enacted prior to the time the volunteers entered the service of the republic, or contemporaneously therewith; and that act was but a reacknowledgment of the prior rights of such volunteers. See Goldsmith v. Herndon, 33 Tex. 710. The eighth subdivision of the declaration of the general convention, adopted November 7, 1835, above referred to, first offered a donation in lands to induce persons to volunteer in the service; and, while it is difficult to indicate the precise legislative act under which Bunson was originally entitled to 960 acres of bounty lands, it is thought that his right thereto may have had its origin in sections 5 and 10 of the ordinance of December 8, 1835, which illustrates the good faith of the struggling republic in making the promise of donations of land to volunteers, as embodied in the eighth subdivision of the declaration by the general convention. 1 Pasch. Dig., arts. 4037–4039. See, also, articles 4057, 4058. It is thus seen that Bunson's right to bounty lands did not originate with the act of 1858, but is clearly traceable to pre-existing laws, which, upon familiar principles, should be held to constitute a contract between the government and the volunteer who availed himself of the benefits of their provisions.

This view of the question was doubtless present in the mind of Mr. Justice Gaines when he prepared the opinion in Nixon v. Cattle Co., 84 Tex. 408, 19 S. W. Rep. 560. In that case the question was whether a bounty warrant, and the land thereby patented, formed part of the community estate. The learned justice clearly draws the distinction between a right to land acquired by onerous title and a pure donation, and holds that the bounty land was the common property of husband and wife. In Nixon's Case (at pages 410, 411, 84 Tex., and page 561, 19 S. W. Rep.) it is said by the court:

"The face of the certificate indicates that it was granted by virtue of the tenth section of the ordinance of December 5, 1835, passed at San Felipe. That section offered a bounty of 320 acres of land for volunteers in the auxiliary corps for three months' service. Pasch. Dig. art. 4039. The right acquired by virtue of that ordinance was clearly acquired by onerous title, and belonged to the volunteer and his wife as common property, provided he had a wife at the time of the acquisition. The donations granted to those who participated in the battle of San Jacinto and to others by the act of December 31, 1836, were not in discharge of any legal obligation, but were a gratuitous bounty extended by the republic in grateful recognition for services which had already been rendered. The latter are properly held the separate property of the grantees. Ames v. Hubby, 49 Tex. 705."

But it is said by counsel for defendants that the decision in Nixon's Case is predicated upon a misapprehension of the Spanish law as it existed in 1836, and is in conflict with Ames v. Hubby, supra, and Fisk v. Flores, 43 Tex. 340. When the two cases last named are carefully considered, the conflict is regarded as apparent, rather than real. Thus, Mr. Justice Moore, in Ames v. Hubby, seems to imply that a grant made to one of the spouses during marriage, in fulfillment of an antecedent promise, would not be the separate estate of the grantee. After defining community property (49 Tex. 710) to be "that acquired by husband or wife by onerous title, while that which is acquired by either of the spouses by gift, devise, or descent is the separate property of the heir, donee, or devisee," he proceeds:

"Now, the very language of this statute imports a direct gift. It was not a grant in fulfillment of an antecedent promise or undertaking, as was the fact in the case of Goldsmith v. Herndon, 33 Tex. 705."

There was no previous obligation on the part of the state to donate lands to those who participated in the battle of San Jacinto, and the grant construed in Ames v. Hubby was therefore a mere gratuity for meritorious services rendered, and properly held to be the separate estate of the donee. In Ames v. Hubby, Mr. Justice Moore has this reference to Fisk v. Flores:

"But even had the grant of these certificates been made to remunerate those to whom they were issued for services rendered, they would still be separate property of the donee. In the case of Fisk v. Flores, 43 Tex. 340, we had occasion to examine this subject somewhat at length, and we found it laid down by the highest authority that a donation in remuneration or compensation for services by one of the spouses is not a part of the community property. Says Escriche, [Diccionario de Legislacion, p. 367:] 'Remunerative or compensatory donations which are made to one of the consorts for his or her individual merits form no part of the community estate;' and that which the husband acquires by military service, and the rewards bestowed upon him by the government for such services, is his separate property."

It may be easily understood how a donation in remuneration or compensation for services rendered by one of the spouses, and how property acquired by the husband as a reward for military service, are the separate estate of the donee, when there was no prior contract between the parties for remuneration, and no previous obligation resting upon the donor to make the donation or reward the soldier; and it is believed that, when this distinction is observed, there will be found to exist no real conflict between the authorities. It is upon this principle, it is thought by the court, that grants made by the king of Spain to one of the spouses were held to be separate property, (Frique v. Hopkins, 4 Mart. [N. S.] 212;) and that certain Mexican grants made to the husband in California, prior to her admission as a state of the Union, were construed to be simple donations, and therefore no part of the community estate, (Scott v. Ward, 13 Cal. 459.) In this connection it may be noted that the courts of this state have uniformly regarded lands patented by virtue of head-right certificates, (Parker v. Chance, 11 Tex. 513,) lands acquired by the husband through the grant of pre-emption, (Allen v. Harper, 19 Tex. 501,) and grants of land to married men under the colonization laws (Yates v. Houston, 3 Tex. 433; Wilkinson v. Wilkinson, 20 Tex. 237)

as community property. It is a fundamental proposition, says Mr. Justice Moore, in Ames v. Hubby, supra, "that community property is that acquired by husband or wife by onerous title." See, also, Scott v. Ward, supra; Johns. Civil Law, marg. p. 57; Schm. Civil Law, p. 13, c. 14, § 1; Yates v. Houston, supra; 5 Nov. Rec. tit. 4, law 11, bk. 10; 2 Alvarez, 109; 1 White, Recop. p. 61; Wilkinson v. Wilkinson, supra. "By 'onerous title' was meant," says the court in Scott v. Ward and Yates v. Houston, "that which was created by valuable consideration,—as, the payment of money, the rendition of services, and the like,—or by the performance of conditions, or payment of charges to which the property was subject."

Referring to bounty warrants and bounty lands, Mr. Justice Stayton, in Todd v. Masterson, supra, says they were properly so termed, "for the lands were 'a premium offered or given to induce men to enlist into the public service;' an extra compensation offered by the government to those persons who should enlist and faithfully discharge the duties of a soldier in the war then pending." By Mr. Bouvier, "bounty" is defined to be "an additional benefit conferred upon, or compensation paid to, a class of persons. It differs from a 'reward,' which is usually applied to a sum paid for the performance of some specific act to some person or persons. It may or may not be a part of a contract. Thus, the bounty offered a soldier would seem to be a part of the consideration for his services." The bounty offered by the ordinances mentioned to induce persons to serve in the army of Texas formed part of the consideration to be paid for their service, and the republic was in honor and duty bound to fulfill her part of the contract when the volunteer had discharged the duty devolving upon him. The bounty warrant, therefore, and the bounty lands granted to Bunson by the state, were not a mere donation for meritorious services performed. They were issued and granted in the discharge of a solemn obligation imposed by laws antedating by the period of 23 years the act of 1858, and constitute a part of the common property of Bunson and his wife, the plaintiff herein.

The land forming part of the community estate, the question recurs, what interest did the plaintiff acquire therein upon the death of her husband? It is unnecessary to refer to Spanish authorities or the decisions of our own courts in support of the well-accepted proposition that, in the absence of debts and all other proper charges against the community estate, upon the death of one of the spouses, a one-half interest in the community property vests absolutely in the survivor, and the remaining half passes to the heirs of the deceased. The plaintiff, therefore, was entitled, at Bunson's death, to one half of the land in controversy, by virtue of her community right. Did she, or could she under any circumstances, assuming that her husband left neither descendants, ascendants, nor collateral relations capable of taking as heirs, inherit, under the Spanish law then of force, the remaining half of the community, which at his death formed part of Bunson's separate estate? After giving this question attentive consideration, the conclusion reached by me is that the adjudications of the Texas courts resolve it against the right of the wife to inherit her

husband's estate. Under some circumstances she succeeded to the marital fourth. But that feature of the present case may be eliminated, as the claim of plaintiff is not asserted to the fourth "as a relief against poverty." She claims the right to take the separate estate of Bunson (the other one half of the community remaining at his death) as his heir. In Babb v. Carroll, 21 Tex. 771, the supreme court, speaking through Mr. Justice Hemphill, says:

"L. X. The law (Nov. Rec. 1, tit. 22, lib. 10) declared that, where there were no heirs, ascendants or descendants, the property of the deceased should go to the treasury. There were previous laws which secured the surviving husband or wife in the succession of the deceased, under certain contingencies. The law (Nov. Rec. 11, tit. 2, lib. 4) of the Fuero Jurgo, which gave the inheritance to the surviving husband or wife when there were no other relations of the deceased to the seventh degree, and the law (6 Nov. Rec. tit. 13, pt. 6) by which the surviving husband or wife succeeded to the estate, when there were no relations within the tenth degree. But these laws were, by commentators generally, supposed to be impliedly repealed by the law above recited from the Recopilacion, although some were of a different opinion, on the ground that the terms of the law in the Recopilacion were general, and did not refer specifically to the former laws on the rights of surviving husband or wife under those laws. The received opinion of commentators has been held as the rule in Texas, namely, that under the Spanish law the surviving husband or wife, under no circumstances, succeeded to the whole estate of deceased, as his heir, and only to the marital fourth when necessary as a relief against poverty."

In Van Sickle v. Catlett, 75 Tex., at page 409, 13 S. W. Rep. 31, the rule announced in Babb v. Carroll is approved in these words: "At the time William G. Logan died, his wife did not inherit his estate." Referring to the facts of that case, it will be seen that Logan died in the year 1835.

But the plaintiff's counsel insist that the rule is otherwise declared by the supreme court of this state in Hill v. McDermot, Dall. Dig. 419, and by the supreme court of Louisiana. A reference to Hill v. McDermot will conclusively demonstrate that a decision of the question was wholly unnecessary in that case, and that the judgment of the court was based altogether on other grounds. Furthermore, the court did not decide it, nor intend to decide it. What is said by the court in that case upon the point is in the nature of a query, with a brief citation from Partidas subjoined, and is embodied in the following extract from the opinion, (page 423:)

"Whether he [referring to the husband] died testate or intestate, or with or without a devisee or heir, was not shown; and whether the witness was or was not mistaken as to knowledge of ownership can alone rest on supposition and conjecture. If Sledge died without an heir of any class, under the Spanish law,—if, too, no one had obtained administration of the succession,—in the absence of any proof showing that the husband had had the sole right, was not his widow the sole heir and owner, and entitled to sue for restoration? 'If no relation exist, [such as might inherit,] and the deceased leave a legitimate wife, she will inherit the whole of his estate; and we say that the husband will inherit from his wife in like circumstances.' 2 Partidas, 1101, 1102."

A number of decisions of the Louisiana supreme court have been examined; but they appear to be founded upon the Code of that state, and not upon the Spanish law, and hence they can scarcely be said to have application to the present subject of discussion. The opinion

of the distinguished jurist, Chief Justice Hemphill, in Babb v. Carroll, with its subsequent approval by the supreme court in 75 Tex. and 13 S. W. Rep., should be regarded as decisive of the question by courts, sitting in this state. In support of it, however, reference will be made to two additional authorities. In Schmidt's Civil Law of Spain and Mexico (page 259, c. 1, art. 1212) it is said:

"The intestate heirs are (1) descendants; (2) ascendants; (3) collateral; and, wanting all these, (4) the public treasury."

"When there are no descendants nor ascendants, either legitimate or natural, and no collaterals within the tenth degree, inclusive, the treasury inherits ab intestato." Id. p. 270, art. 1266.

Upon the same point Judge Johnston says:

"In default of descendants, ascendants, and collaterals, the crown or exchequer (la real camara) succeeds to the property of an intestate.".Johns. Civil Law, marg. p. 121.

. The plaintiff, therefore, was not an heir of her husband, and did not inherit his estate.

5. The plaintiff acquired a real, beneficial interest in and to one half of the land in controversy by virtue of her community rights; but the interest and title thus acquired were equitable. The legal title to the land passed by the patent to Gustavus Bunson. This principle is so well established by the more recent decisions of the supreme court of this state that the court will content itself with a mere reference to the authorities. Hill v. Moore, 62 Tex. 610; Edwards v. Brown, 68 Tex. 329, 4 S. W. Rep. 380, and 5 S. W. Rep. 87; Patty v. Middleton, 82 Tex. 586, 17 S. W. Rep. 909. See Gould v. West, 32 Tex. 349; Rev. St. Tex. art. 3961; 1 Pasch. Dig. art. 4288.

6. In this court, "where the distinction between legal and equitable proceedings is strictly maintained, and remedies afforded by law and equity are separately pursued," the action of trespass to try title "can only be sustained upon the possession by the plaintiff of the legal title." Gibson v. Chouteau, 13 Wall. 92; Langdon v. Sherwood, 124 U. S. 74, 8 Sup. Ct. Rep. 429; Redfield v. Parks, 132 U. S. 239, 10 Sup. Ct. Rep. 83; Shierburn v. De Cordova, 24 How. 423; Johnson v. Christian, 128 U. S. 374, 9 Sup. Ct. Rep. 87; Bennett v. Butterworth, 11 How. 669; Bagnell v. Broderick, 13 Pet. 436; Hooper v. Scheimer, 23 How. 235. The plaintiff, having only an equitable title to one half the land in controversy, and no claim whatever to the remaining half, cannot maintain this suit. Her proper forum is a court of equity.

For the reasons assigned, the first and second exceptions to the answer will be overruled; and, as a decision of the questions discussed disposes of every material and practical issue in the case, the third exception will be formally overruled, without passing upon the points therein raised. Ordered accordingly.